**PITTSBURGH PLATE GLASS COM-
PANY, Plaintiff,**

v.

**David L. LADD, Commissioner of
Patents, Defendant.**

**Civ. A. No. 3163–61.**

United States District Court
District of Columbia.

July 18, 1963.

C. Willard Hayes, Cushman, Darby &
Cushman, Washington, D. C., Oscar L.
Spencer, Aubrey L. Burgess, James G.
Watterson, Pittsburgh, Pa., for plaintiff.

Clarence W. Moore, Sol., U. S. Patent
Office, Washington, D. C., for defendant.

JACKSON, Judge.

This is an action brought pursuant to
35 U.S.C. § 145 in which plaintiff herein,
assignee of applicant Jean M. Peeters,
seeks to have the Court authorize the is-
suance to him of a patent on certain
claims in Patent Application Serial No.
549,466, filed November 28, 1955, entitled
"Manufacture of Sheet Glass".

The tribunals of the Patent Office re-
jected all of claims 19, 20, 21 and 22, as
being unpatentable in view of the prior
art.

Counsel for plaintiff conceded that all
of the claims stand or fall together, and

that claim 21, which required reference
to the Gregorius patent No. 1,610,443,
issued December 14, 1926, has added
nothing patentable to the remaining
claims. That reference shows a cooler
in a Pennvernon drawing chamber which
applies greater cooling effect at the cen-
ter than at the ends.

It was further conceded that every-
thing disclosed in the involved applica-
tion is old except for the addition of cer-
tain cooling means. Therefore, the Court
gives no consideration to the said Gre-
gorius patent, nor to the reference pat-
ents of Halbach et al., No. 2,519,457,
issued August 22, 1950, and the Tharp
patent, No. 2,284,348 issued May 26,
1942, but limits its consideration to the
reference patent Small et al., No. 1,634,-
802, issued July 5, 1927, and the pat-
ent to French, No. 1,795,943, issued
March 10, 1931. The last named patents
are considered in connection with an al-
leged improvement by plaintiff in the
Pennvernon process of the making of
sheet glass.

Claim 19 is illustrative and reads as
follows:

"19. In drawing a continuous rib-
bon of sheet glass from the surface
of a body of glass at a location above
a submerged draw bar and within
the confines of a drawing chamber
the front and rear extremities of
which are defined by L-blocks and in
which the gather is fed by two op-
positely flowing surface streams.
each originating at a spring zone in-
side the drawing kiln but outside the
L-blocks and flowing under an L-
block, the improvement which com-
prises selectively cooling at least one
of such surface streams at a zone
between the origin and the L-block
under which it flows without appre-
ciably cooling glass flowing away
from the gather in the kiln."

The Pennvernon process of drawing
sheet glass is accomplished by means of
an apparatus wherein a stream of molten
glass enters the drawing kiln and divides
into two parts, one flowing upwardly to·

an area called a "spring zone", and the other flowing across the kiln toward the end wall, and then upwardly to a "second" spring zone. At each of the zones the stream divides into two parts, one flowing toward a draw bar, and the other in the opposite direction, and either returning to the reservoir from which the molten glass enters the kiln, or mixing with the fresh glass fluid entering the kiln.

The streams of glass flowing between the draw bar and the drawing chamber move upwardly to form a sheet, the glass being cooled to render it viscous by coolers in the path as the sheet is drawn upward. These coolers are designed for rapid cooling of the glass sheet in order to give it proper rigidity so that it is drawn upwardly at a relatively high speed, the maximum of which is attained by a cooling of the glass in the drawing chamber to the greatest permissible degree of cooling. Excessive cooling must be avoided so as not to result in undesirable effects in the final product.

The patent to Halbach et al. No. 2,519,-457, and the patent to Tharp No. 2,284,-348, are representative of patents showing the Pennvernon process.

The plaintiff, in order to increase the drawing speed, sought to obtain a greater degree of cooling, minus undesirable effects that might follow by increased cooling of the glass in the drawing chamber. His notion, as set out in the application, consisted of adding coolers external of the drawing chamber between the spring zones and the L-blocks under which the surface stream of glass flows toward the gather.

Thus it will be seen that in the Pennvernon process with the added devices, the selective cooling of the top surface stream of glass in a zone between a spring zone and the L-block, as the stream flows toward the gather, without at the same time cooling the under stream of glass flowing away from said zone, has resulted in a substantial increase in drawing speed. The tribunals of the Patent Office held that it should be obvious to one having ordinary skill in the Pennvernon

sheet glass flowing art, to affect the improvement disclosed by plaintiff in view of the Small et al., and the French references.

The Colburn process in use by a competitor of plaintiff, and the Pennvernon process for glass drawing, appear to be in the same art. Both are directed to the same end product, and the basic steps are the same. In each, molten glass continually flows from a melting furnace to a drawing chamber. A ribbon of sheet glass is drawn from the surface of the molten mass.

In the Colburn process the chamber, called a draw pot, does not have a shutoff or a draw bar. Glass is drawn in a ribbon between cover members above the glass surface and between coolers which promote rapid cooling of the glass. The glass ribbon, instead of being carried vertically while cooling, as in the Pennvernon process, is bent 90° over a roller and carried horizontally for final cooling.

The patent to Small et al., No. 1,634,-802 relates to the drawing of sheet glass, and discloses that an "additional cooling or heat-absorbing body is positioned closely adjacent the surface of that portion of the molten glass which is flowing from the glass-producing tank into the receptacle from which the sheet is drawn. This additional cooling body functions to protect the surface glass in the draw-pot from the direct action of heated gases from the furnace, and also by rapidly absorbing heat from the surface strata of the flowing glass prior to its entrance to the draw-pot expedites the conditioning of the glass in the pot and permits a more rapid withdrawal of glass therefrom in sheet form".

If difficulty were experienced in the Small et al. process by reason of excessive cooling at the side walls, it would be obvious to use a cooler such as that of Gregorius to apply greater cooling effect at the center than at the side walls.

The French reference, No. 1,795,943, entitled "Apparatus For Drawing Sheet Glass" discloses a cooling element closely adjacent the front lip-tile or L-block

permitting the lower portion of the cooling element to extend under the lip-tile. As indicated therein: "A cooler of this construction will naturally absorb a greater amount of heat and will produce a greater chilling effect on the molten glass passing thereunder, whereby to permit a more rapid withdrawal thereof into sheet form".

Plaintiff, in his brief, contends that "The key references are drawn from non-analogous art." It would appear from an examination of the cited references that this contention is clearly refuted.

At the trial herein the assignor of the application, together with others highly skilled in the art, testified on behalf of plaintiff, and many exhibits were introduced.

It appears to the Court that the coolers in both the Small et al. and French references extract heat from a surface stream of molten glass moving toward a drawing chamber.

In the Pennvernon process the apparatus includes a surface stream of molten glass moving toward the drawing chamber. The fact that in that process the depth of the chamber, the presence of a draw bar, the direction of passage of the glass ribbon, and the recirculating correctness, would not lead one to try out the Small et al., or French coolers in the Pennvernon process was not pointed out or shown by counsel. Furthermore, the claims do not specify the depth of the drawing chamber or kiln, nor do they call for a shut-off defining the kiln. Neither do they call for a return flow from the kiln to the melting tank, or to drawing the glass ribbon vertically until completely cooled. What differences there may be in structure not set forth in the claims are immaterial. Application of Copping, 203 F.2d 731, 40 CCPA 950; Application of Sebald, 268 F.2d 430, 46 CCPA 964.

It is contended, on behalf of plaintiff, that the auxiliary or last named coolers in the Pennvernon process is critical with regard to their placement. The Board held that the location of the "exact point at which best results· can be obtained

may be determined by simple experimentation."

It has been stated in the testimony here that considerable expense would be involved in determining, by experiment, the exact point in which to place the auxiliary coolers and, therefore, the expense of experimentation could not be "simple".

The Court agrees with counsel for defendant that in a patent sense "simple" means experimentation requiring no extraordinary talent in conception or execution and that an attempt to equate "simple" with "inexpensive" is without merit.

The Small et al. patent, and the French patent, would each suggest to a person normally skilled in the glass drawing art the use in the Pennvernon process of a cooler situated outside the drawing chamber but within the drawing kiln over a surface stream of glass flowing toward the gather.

Likewise, Small and French would each suggest to a person normally skilled in the art the use of a cooler in the Pennvernon process at a zone between a spring zone and the L-block under which a surface stream of glass flows from the spring zone toward the gather.

Given the suggestion by Small et al., and by French, that a cooler be used in the Pennvernon process outside the drawing chamber, the placement of the cooler in such a position as to cool glass flowing toward the gather but not to cool glass flowing away from the gather would be obvious to one skilled in the art.

After a painstaking examination of the record in the Patent Office, together with that made in the Court, and a study of the able briefs by counsel, the Court is impelled to find that in all of the record there is not sufficient evidence upon which could be predicated clear error on the part of the tribunals of the Patent Office.

The Court further finds that the differences between the subject matter of claims 19, 20, 21 and 22 of the application in suit, and the prior art, are such that the subject matter, as a whole, would have been obvious at the time Jean M.

Peeters devised his process to a person having ordinary skill in the sheet glass drawing art.

In accordance with the foregoing discussion, the Court concludes that plaintiff is not entitled to a patent containing any of claims 19, 20, 21, and 22 of the application of Jean M. Peeters, Serial No. 549,466, and therefore, the Complaint should be dismissed.

What has been stated herein shall constitute Findings of Fact and Conclusions of Law.